# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DEANGELO MCDONALD** | ) | |
| **5108 E STREET, S.E.** | ) | **Case No.:** |
| **WASHINGTON, D.C. 20019** | ) | **Judge:** |
| *Plaintiff* | ) | **COMPLAINT** |
| | ) | **VIOLATIONS OF THE FAIR** |
| **v.** | ) | **HOUSING ACT (42 U.S.C.** |
| | ) | **3601-3619) AND THE EQUAL** |
| **SUNTRUST MORTGAGE, INC.** | ) | **CREDIT OPPORTUNITY** |
| **901 SEMMES AVENUE** | ) | **ACT (15 U.S.C. 1691)** |
| **RICHMOND, VA.** | ) | |
| *Defendant* | ) | |
| | ) | |

## COMPLAINT

COMES NOW Plaintiff, who alleges:

## INTRODUCTION

1.   Plaintiff brings this action against SunTrust Mortgage, Inc. for discriminating against them in its residential mortgage lending program.

2.    From 2005 to 2009, SunTrust Mortgage annually originated between 120,000 and 200,000 mortgage loans with an annual principal value of more than $30 billion through its wholesale channels using mortgage brokers, making it one of the nation's twenty largest mortgage lenders in each of those years. Throughout this period, SunTrust Mortgage offered nearly every type of mortgage loan product available in the market, and it generally concentrated on conforming prime loans.

3.    As a result of SunTrust Mortgage's policies and practices, more than 20,000 African-American and Hispanic borrowers paid SunTrust Mortgage higher loan fees and costs for their home mortgages than non-Hispanic White borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race or national origin. These included the Plaintiff herein.

4.    SunTrust Mortgage's discrimination increased loan prices for many of the African-American borrowers, including Plaintiff, who obtained loans between 2005 and 2009 in Southeastern and Mid-Atlantic states, the District of Columbia and through SunTrust Mortgage's national network of mortgage brokers.

5.    The victims of SunTrust Mortgage's discrimination were located in more than 75 geographic markets spread throughout the United States. For example, the statistical analyses discussed below found the ten metropolitan markets with the most victims were located throughout the country: Atlanta, Washington, D.C., Miami, Los Angeles, Orlando, Virginia Beach, Riverside, Richmond, Virginia, Phoenix and San Francisco-Oakland. Plaintiff's mortgage loan was issued in connection with his purchase of a home in Washington, D.C. Nearly 60% of the victims of SunTrust Mortgage's discrimination are African-American, including the Plaintiff.

6.    While it knew about discriminatory prices, SunTrust Mortgage maintained compensation systems that promoted such discrimination by sharing discriminatory charges with any retail mortgage loan officer or

wholesale mortgage brokers who could obtain inflated prices from African-American and Hispanic borrowers.

7.     The higher borrowing costs SunTrust charged to African-American and Hispanic families – whether paid as higher up-front fees or higher interest rates – put increased economic burdens on those families, including Plaintiffs'.

8.     The United States brought a law suit to hold SunTrust Mortgage accountable for these serious violations of law and remedy the substantial and widespread harmful consequences of SunTrust Mortgage's discriminatory lending policies and practices. SunTrust Mortgage settled that case and offered token compensation to members of the classes of discrimination victims the investigation identified, including Plaintiff. Plaintiff, however, rejected SunTrust Mortgage's offer of token compensation in favor of this law suit in order to obtain a suitable remedy.

9.     This Court has jurisdiction over Plaintiff's suit pursuant to 28 U.S.C. section 1345, 42 U.S.C. section 3614, and 15 U.S.C. section 1691e(h). Venue is appropriate pursuant to 28 U.S.C. section 1391.

## DEFENDANT

10.     SunTrust Mortgage, Inc., a Virginia corporation, is a wholly owned , subsidiary of SunTrust Bank, a bank chartered by the Georgia Department of Banking and Finance and a member of the Federal Reserve System. SunTrust Bank is the nation's eleventh largest commercial bank. SunTrust Mortgage's principal place of business is 901 Semmes Avenue, Richmond, Virginia. During the period of time relevant to the events at issue in this Complaint, SunTrust Mortgage was subject to the regulatory authority of the Board of Governors of the Federal Reserve System.

11.     SunTrust Mortgage is subject to federal laws prohibiting lending discrimination, including the Federal Housing Act ("FHA") and the Equal Credit Opportunity Act ("ECOA") and the regulations promulgated under

each of these laws. The FHA and the ECOA prohibit lenders from discriminating on the basis of, inter alia, race or national origin in their lending practices. Charging higher prices for loans on the basis of race or national origin, including charging higher discretionary fees at the time of origination and charging higher rates of interest, is a discriminatory lending practice prohibited by the FHA and the ECOA.

12.     SunTrust Mortgage is a "creditor" within the meaning of the ECOA, 15 U.S.C. section 1691a(e), and it engages in "residential real estate-related transactions" within the meaning of the FHA, 42 U.S.C. section 3605. SunTrust Mortgage also is subject to the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. section 2803, which requires mortgage lenders to collect and maintain data on the race and national origin of each applicant for a home loan.

## PLAINTIFF

13.     Plaintiff is an individual who resides at 5108 E Street, S.E., Washington, D.C. 20019.  In 2008, Plaintiff entered into a mortgage agreement with Defendant for the home in which they currently reside. During this period, Defendant was engaged in a pattern of discriminatory practices against African-Americans in the District of Columbia who entered into such mortgage agreements with Defendant. This conduct included their mortgage agreement with the Plaintiff.

### REFERRAL TO U.S. DEPARTMENT OF JUSTICE FROM BANK REGULATORY AGENCY

14.     Beginning in 2007, Federal Reserve System examiners conducted a review of the lending practices of SunTrust Mortgage to evaluate compliance with the FHA and the ECOA. As a result of this review, the Federal Reserve Board determined that it had "reason to believe that SunTrust Mortgage Incorporated engaged in a pattern or practice of

mortgage pricing discrimination based on race ... and national origin in violation of ... the Equal Credit Opportunity Act and the Fair Housing Act."

15.    Following its determination described in the previous paragraph and pursuant to 15 U.S.C. section 1691e(g), the Federal Reserve Board referred the matter to the United States Department of Justice on December 3, 2009. Through a series of tolling agreements, SunTrust Mortgage agreed to a suspension of the running of any applicable statute of limitations from December 28, 2009 through May 31, 2012 for "any cause of action or related claim or or remedy arising from the issues referred" by the Federal Reserve Board.

16.    Based on the Federal Reserve Board referral, the Department of Justice has engaged since 2010 in an investigation of SunTrust Mortgage's lending policies, practices and procedures, including reviewing internal company documents and non-public loan-level data on more than 850,000 residential mortgage loans SunTrust mortgage originated between 2005 and 2009.

## FACTUAL ALLEGATIONS

17.    Beginning prior to January, 2005 and continuing through December, 2009, SunTrust Mortgage originated residential mortgage loans through both a retail channel, with roughly 200 offices in more than a dozen states in the southeastern and mid-Atlantic U.S., and a wholesale channel, with a network of mortgage brokers located across the United States. SunTrust Mortgage located its retail offices in markets where SunTrust Bank operates, and immediately adjacent states, and it obtained customers through referrals from SunTrust Bank branches.

## Retail Lending Pricing

18.     Between 2005 and 2008, SunTrust Mortgage charged African-
American borrowers, including Plaintiff, higher fees and costs than non-
Hispanic white retail borrowers not based on their creditworthiness or other
objective criteria related to borrower risk, but because of their race. It was
SunTrust Mortgage's business practice to allow its employees who
originated loans through its retail channel to vary a loan's interest rate and
other fees from the price initially set based on a borrower's objective
credit-related factors. This subjective and unguided pricing discretion
resulted in African-American borrowers, including Plaintiff, paying more
not based on borrower risk than non-Hispanic white borrowers both on a
nationwide basis and in dozens of geographic markets in southeastern and
mid-Atlantic states, including the District of Columbia, where SunTrust
Mortgage originated a large volume of loans. As a result of SunTrust
Mortgage's discriminatory retail pricing practices, an African-American
borrower, including Plaintiff, paid, on average, hundreds of dollars more
for a SunTrust Mortgage retail loan.

19.     SunTrust Mortgage's retail pricing monitoring efforts, while inadequate
to remedy discriminatory practices against African-American borrowers
between 2005 and 2008, were sufficient to put it on notice of widespread
pricing disparities based on race. Even when SunTrust Mortgage had
reason to know there were disparities, however, SunTrust Mortgage did not
act to determine the full scope of these retail pricing disparities, nor did it
take prompt and effective action to eliminate these disparities.

20.     Before January, 2005 and continuing through December, 2008,
SunTrust Mortgage set prices, including the interest rate and points, on a
daily basis for its various retail mortgage loan products based on the current
market rate of interest and the prices it would receive by selling loans to
investors, plus a profit margin for SunTrust Mortgage. These prices were
communicated through "rate sheets" which were available to its retail
mortgage loan officers and other retail lending employees.

21. During that period, SunTrust Mortgage also issued on a frequent basis,
typically at least once per month, "Retail Program Pricing Adjustments"

worksheets that dictated the adjustments that would be made to the price on the rate sheet based on numerous objective credit characteristics of applicants. For instance, the Retail Pricing Adjustment worksheet issued on July 1, 2008 specified that borrowers receiving a conforming fixed rate mortgage loan who had less than 30% equity in their home had to pay a higher price when they had a FICO credit score below 720, and borrowers receiving such a loan had to pay an even higher price when they had a FICO credit score below 680. That same worksheet specified that borrowers receiving a conforming fixed rate mortgage loan who had more than 40% equity in their home had to pay a lower price than borrowers with less equity, regardless of credit score. These pricing adjustments were intended to compensate fully SunTrust Mortgage and the investors who bought its mortgage loans for borrowers' differences in credit risk.

22. By consulting the rate sheets in conjunction with the retail Pricing Adjustments worksheets, or computer systems that relied on the data contained in those two sources, SunTrust Mortgage retail mortgage loan officers determined the interest rate, fees and points to quote individual mortgage loan applicants based on their objective credit characteristics. Individual mortgage loan applicants did not have access to the rate sheets or Retail Program Pricing Adjustment worksheets, and could not apply for a retail mortgage loan from SunTrust Mortgage except at the price quoted by their mortgage loan officer.

23. Before January 2005 and continuing through December, 2008, SunTrust Mortgage gave its retail mortgage loan officers, and other employees who participated in the loan origination process, discretion to deviate upward or downward from the loan price that was set based on the borrower's objective credit characteristics using the rate sheets and Retail Program Pricing Adjustment worksheets. This discretion was granted through formal SunTrust Mortgage policies, including the "Premium/Subsidy Policy" and the "Retail Discretionary Pricing Management Policy."

24. SunTrust Mortgage retail mortgage loan officers could exercise discretion to deviate from the loan price that was set based on the borrower's

objective credit characteristics using the rate sheets and Retail Program Pricing Adjustment worksheets in three ways: by altering the interest rate, by altering the origination fee, and by altering the standard allocation of closing costs between the borrower and SunTrust Mortgage.

25. SunTrust Mortgage regularly calculated a "net overage" for each retail mortgage loan. The net overage approximates the amount, positive or negative, by which the total cost of a mortgage loan to a borrower differs from the total cost to the borrower of that loan had it closed at the price set by the rate sheet and Retail Program Pricing Adjustment worksheets based on the borrower's objective credit characteristics. A positive net overage raises the total cost of mortgage loans to borrowers above what they would pay if the loans were closed based on the prices that were set based on the borrower's objective credit characteristics. A negative net overage – which SunTrust Mortgage called an "underage" – lowers the total cost of mortgage loans to borrowers below what they would pay if the loans were closed based on the prices that were set based on the borrower's objective credit characteristics.

26. Retail mortgage loan officers' compensation varied based on these discretionary pricing adjustments. Loan officers were paid based on their volume of mortgage loans plus a share of SunTrust Mortgage's profit produced by pricing deviations. The compensation system allowed loan officers to receive extra compensation for making loans with overages or small underages, and increased compensation for a greater overage or a smaller underage.

27. Since at least 2001, SunTrust Mortgage's internal policies recognized that discrimination could result from allowing its mortgage loan officers to engage in discretionary pricing adjustments.

28. SunTrust Mortgage continued to allow mortgage loan officers to charge overages and raise their compensation through discretionary pricing until April 2010.

29. Between at least January, 2005 and December, 2008, SunTrust Mortgage did not establish objective criteria, or provide guidelines, instructions, or procedures to its retail mortgage loan officers, for setting overages or underages. Instead, it granted individual retail nortgage loan officers, and other individual employees, discretion to subjectively set overages and underages within broad parameters limited only by a policy that purported to cap overages at 100 basis points before August 1, 2008 and 50 basis points starting August 1, 2008, and a requirement that underages of more than 100 basis points be approved by a manager. A basis point is a percentage of the total amount of a loan, with one hundred basis points equaling one percent of the loan amount. Before April, 2007, SunTrust Mortgage did not centrally monitor adherence to these limits.

30. The majority of SunTrust Mortgage's retail borrowers received underages between 2005 and 2008 because the high profit margins built into SunTrust Mortgage's rate sheets made its rates uncompetitive with other lenders. Consequently, among all borrowers, the average net overage charged each year during that period was negative.

31. Charging a higher net overage on the basis of race, whether through SunTrust Mortgage's inclusion of a greater overage or a smaller underage in the price of the mortgage loan, is a discretionary lending practice by SunTrust Mortgage prohibited by the FHA and the ECOA.

32. For each retail mortgage loan that SunTrust Mortgage originated, information about each borrower's race and the amount of overage or underage paid was available to, and was known by, SunTrust Mortgage. SunTrust Mortgage was required to collect, maintain, and report data with respect to significant mortgage loan terms and borrower information for residential loans, including the race of each retail home loan borrower, pursuant to HMDA.

33. SunTrust Mortgage regularly monitored between 2005 and 2008 the racial disparities that existed in the net overage it charged on mortgage loans, and

it knew racial disparities in net overage existed throughout that period on the national level and in multiple regional markets.

34. Statistical analyses of retail mortgage loans originated by SunTrust Mortgage between January 2005 and December 2008 demonstrate statistically significant discriminatory pricing disparities in retail mortgage loans based on race. Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 5%.

35. Measured on a nationwide basis by net overage, in each year between 2005 and 2008, SunTrust Mortgage charged African-American borrowers whom SunTrust Mortgage determined had the credit characteristics to qualify for a home mortgage loan more in pricing adjustments not based on borrower risk for retail loans than non-Hispanic white borrowers. The annual net overage disparities ranged between approximately 19 and 26 basis points, and they are significant statistically.

36. In approximately 63% of the high loan-volume markets in 2005 (17 of 27), defined for purposes of this paragraph as those metropolitan statistical areas ("MSAs") and non-MSA areas in each state where SunTrust Mortgage made more than 100 total retail mortgage loans and 30 or more retail mortgage loans to African-American borrowers in a given year, SunTrust Mortgage charged African-American borrowers more in pricing adjustments not based on borrower risk for retail loans, as measured by net overage, than non-Hispanic White borrowers by a statistically significant amount. In 2006, approximately 58% of such markets (20 of 34); in 2007, approximately 54% of such markets (19 of 35); and in 2008, approximately 52% of such markets (14 of 27) showed statistically significant net overage disparities disfavoring African-American retail borrowers. The disparities in pricing adjustments not based on borrower risk resulted in African-American borrowers in these markets paying beween approximately 12 and 80 basis points more than non-Hispanic white borrowers for retail loans in a given year. In 2005 and 2006, there were no high loan volume markets in

which SunTrust Mortgage charged non-Hispanic white borrowers significantly higher net overage for retail loans than African-American borrowers in a given year; in 2007 and 2008, the number of such markets in a given year ranged only between 1 and 2, or 4% to 6%, of the high loan volume markets.[1]

37. These net overage disparities mean, for example, that SunTrust Mortgage in 2007 charged a retail customer in Atlanta borrowing $200,000 an average of about $745 more in pricing adjustment not based on borrower risk if were African-American, than the average amount charged to a non-Hispanic White borrower. In 2008, SunTrust Mortgage charged African-American retail customers in Washington, D.C. borrowing $200,000 approximately $630 more than the average amount SunTrust Mortgage charged in pricing adjustments not based on borrower risk to a non-Hispanic White borrower.

38. In setting the terms and conditions for its retail mortgage loans, including interest rates, points, and fees, SunTrust Mortgage accounted for individual borrowers' differences in credit risk characteristics by setting the prices shown on its rate sheets and Retail Program Pricing Adjustments worksheets for each loan product to include its assessment of applicant creditworthiness as explained in Paragraphs 20-22. SunTrust Mortgage's loan officers' pricing adjustments, as measured by net overage, were separate from and not controlled by the credit risk adjustments already reflected in the rate sheets and Retail Program Pricing Adjustments worksheets. Accordingly, the racial net overage disparities described in paragraphs 33-34 are not adjusted for borrowers' credit risk characteristics.

39. Regression analyses of SunTrust Mortgge retail pricing that control for credit-related factors such as credit score, loan amount, loan to value ratio,

---

[1]     The inclusion throughout this Complaint of statistical analyses for high loan volume markets is intended only to provide examples of SunTrust Mortgage's violation of lending discrimination laws. SunTrust's discriminatory behavior extended to beyond these examples.

loan purpose, and others, also demonstrate that the racial disparities in
pricing adjustments described in paragraphs 33-34 produced racial
disparities in the annual percentage rate of interest charged by SunTrust
Mortgage between 2005 and 2008 to African-American retail borrowers
that cannot be explained by credit risk factors. Thus, accounting for
borrower credit risk factors does not explain the racial disparities, even if
those factors were relevant to the subjective pricing adjustments measured
by net overage.

40. The statistically significant racial disparities in net overage described in
paragraphs 33-34 for African-American retail borrowers who SunTrust
Mortgage determined had the credit characteristics to qualify for a home
mortgage loan resulted from the implementation and interaction of
SunTrust Mortgage's policies and practices that: (a) allowed subjective and
unguided pricing adjustments not based on borrower risk by its own
employees, including retail mortgage loan officers, in setting overages and
underages and their including those overages and underages in the terms
and conditions of loans SunTrust Mortgage originated; (b) did not require
its employees to justify or document the reasons for many of the pricing
adjustments not based on borrower risk; (c) failed to adequately monitor for
and fully remedy the effect of racial disparities in those pricing
adjustments; and (d) linked loan officer compensation in part to the
charging of overages and underages. Net overage specifically measures the
pricing variation caused by the subjective and unguided pricing adjustments
not based on borrower risk. SunTrust Mortgage continued to use this non-
risk-based component of its overall retail loan pricing policy, to
inadequately document and review the implementation of that pricing
component, and to link loan officer compensation to overages and
underages through at least the end of 2008.

41. SunTrust Mortgage's policies and practices identified in the previous
paragraph were not justified by business necessity or legitimate business
interests. There were less discriminatory alternatives available to SunTrust
Mortgage than these policies or practices. SunTrust Mortgage was able to
substantially reduce its racial pricing disparities, yet continue as a leading

national retail mortgage loan originator, in 2009 and later years after it altered the policies and practices identified in the previous paragraph by limiting its employees' ability to make pricing adjustments not based on borrower risk and eliminating the compensation incentives to make such adjustments.

42. SunTrust Mortgage had knowledge that the subjective and unguided discretion it granted to mortgage loan officers in its retail mortgage loan pricing policies and practices was being exercised in a manner that discriminated against African-American borrowers, but it continued to implement its policies and practices with that knowledge. SunTrust Mortgage did not take effective action before the end of 2008 to change the pricing adjustment policies or practices to fully eliminate their discriminatory impact, nor did it change its compensation policy to discourage the charging of overages or small underages. It did not act before the end of 2008 to identify or compensate the individual borrowers who were victims of its discriminatory retail mortgage loan loan pricing policies or practices.

## Wholesale Lending Pricing

43. Between 2005 and 2009, SunTrust Mortgage charged African-American and Hispanic borrowers higher fees and costs than non-Hispanic White wholesale borrowers not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race or national origin. It was SunTrust Mortgage's business practice to allow mortgage brokers who generated loan applications through its wholesale channel to vary a loan's interest rate and other fees from the price initially set based on a borrower's objective credit-related factors. This subjective and unguided pricing discretion resulted in African-American and Hispanic borrowers paying more not based on borrower risk than non-Hispanic white borrowers both on a nationwide basis and in dozens of geographic markets across the country where SunTrust Mortgage originated a large volume of wholesale loans. As a result of SunTrust Mortgage's discriminatory wholesale pricing

practices, an African-American or Hispanic borrower paid, on average, hundreds of dollars more for a SunTrust Mortgage wholesale loan.

44. SunTrust Mrtgage's wholesale pricing monitoring efforts, while inadequate to remedy discriminatory practices against African-American and Hispanic borrowers between 2005 and 2009, were sufficient to put it on notice of widespread pricing disparities based on race and national origin. Even when SunTrust Mortgage had reason to know there were disparities, however, SunTrust Mortgage did not act to determine the full scope of those wholesale pricing disparities, nor did it take prompt and effective action to eliminate those disparities.

45. Prior to January 2005 and continuing at least until December, 2009, SunTrust Mortgage originated and funded residential mortgage loans through a wholesale channel. Applications for these loans were brought to SunTrust Mortgage by several thousand mortgage brokers throughout the United States who had entered into contracts with SunTrust Mortgage for the purpose of bringing mortgage loan applications to it for origination and funding.

46. SunTrust Mortgage's relationship with the mortgage brokers who brought mortgage loans to it was governed throughout the time period at issue by its standard Mortgage broker Agreement. The Mortgage Broker Agreement from 2005 through 2009 consistently contained extensive provisions detailing that SunTrust Mortgage maintained ultimate control over all lending decisions, including pricing terms and conditions, for mortgage loans made through its its wholesale channel. SunTrust Mortgage was directly and extensively involved in setting the complete terms and conditions of wholesale mortgage loans.

47. SunTrust Mortgage evaluated the risk of making each wholesale mortgage loan using SunTrust Mortgage's underwriting guidelines and determined whether to originate and fund the loan. The Mortgage broker Agreement provided that SunTrust Mortgage would "make a decision on the (loan) Application in its sole discretion." The Mortgage Broker Agreement also

provided that each mortgage loan approved by SunTrust Mortgage for funding would be closed in the name of SunTrust Mortgage.

48. Before January 2005 and continuing through December 2009, SunTrust Mortgage set prices, including the interest rate and points, on a daily basis for its various wholesale home mortgage loan products based on the current market rates of interest and the price it would receive by selling loans to investors, plus a profit margin for SunTrust Mortgage. These prices were communicated to its mortgage loan brokers through "rate sheets."

49. During that period, SunTrust Mortgage also issued on a frequent basis, typically at least once per month, pricing adjustment worksheets for the broker channel that dictated the adjustments that would be made to the price on the rate sheet based on numerous objective credit characteristics of applicants. For instance, the pricing adjustment worksheet issued on January 23, 2009 specified that borrowers receiving a conforming fixed rate mortgage loan who had between 20% and 25% equity in their home had to pay a higher price for every 20 points their FICO credit score fell below 740. That same worksheet specified that conforming fixed rate borrowers of all credit scores had to pay a higher price when they wanted to cash out equity from their home as part of a refinancing transaction. These pricing adjustments were intended to fully compensate SunTrust Mortgage and the investors who bought its loans for differences in borrowers' credit risk.

50. By consulting the rate sheets in conjunction with the pricing adjustments worksheets, or computer systems that relied on the data contained in those two sources, SunTrust Mortgage mortgage brokers determined the interest rate, fees and points to quote individual mortgage loan applicants based on their objective credit characteristics. Individual loan applicants did did not have access to the rate sheets or pricing adjustment worksheets, and could not apply for a wholesale mortgage loan from SunTrust Mortgage except at the price quoted by their mortgage broker.

51. Under the Mortgage Brokers Agreement, SunTrust Mortgage delegagted to mortgage brokers the task of informing prospective borrowers of the terms

and conditions under which SunTrust Mortgage wholesale loans were available. SunTrust Mortgage did not require the mortgage brokers to inform a prospective borrower of the lowest price for which he qualified for a specific loan product.

52. Before January 2005 and continuing through December 2009, SunTrust Mortgage gave its mortgage brokers discretion to deviate upward or downward from the loan price that was set based on the borrower's objective credit characteristics using the rate sheets and pricing adjustment worksheets. This step of pricing wholesale loans permitted mortgage backers to exercise subjective, unguided discretion in setting the final price SunTrust Mortgage charged to individual borrowers, unrelated to a borrower's credit risk characteristics.

53. Mortgage brokers who supplied SunTrust Mortgage with mortgage loan applications that SunTrust Mortgage funded were compensated in two ways. One was through a yield spread premium ("YSP"), an amount paid by SunTrust Mortgage to the brokers based on a borrower's particular credit qualifications, set by the rate sheet and pricing adjustment worksheet. The second way brokers were compensated was through direct fees paid to brokers out of borrowers' funds, including loan proceeds at the loan closing.

54. Based on these two forms of compensation, SunTrust Mortgage calculated the "total compensation" charged on each wholesale mortgage loan. Higher total compensation raised the borrower's price for a loan, through a higher note interest rate, a higher final annual percentage rate charged on a loan, and/or a higher final total amount borrowed. SunTrust Mortgage continued to allow mortgage brokers to charge YSPs and raise their compensation through pricing adjustments through a least December, 2009.

55. During the time period at issue, SunTrust Mortgage was fully informed of all broker compensation to be charged with respect to each individual residential loan application presented to it. The Mortgage Broker Agreement required brokers to provide "full and complete information"

regarding all broker compensation charges at least two days prior to the loan's closing.

56. The Mortgage Broker's Agreement allowed SunTrust Mortgage to control the charges in included in the terms of the loan for broker compensation. SunTrust Mortgage exercised its right to control broker compensation, but it left wide discretion to mortgage brokers on the compensation charge that SunTrust Mortgage included in the terms of the loan between at least January 2005 and December 2009. Beginning prior to Januay 2005 and continuing through December 2009, SunTrust Mortgage's policy and practices allowed brokers subjective, uynguided discretion in setting the amount of broker compensation charged to individual borrowers. Prior to August, 2008, SunTrust Mortgage placed a 5% ceiling on roker compensation, apart from YSP, it charged to borrowers in agency mortgage loan products (loans saleable to Fannie Mae and Freddic Mac). Starting in August 2008, SunTrust Mortgage placed a purported 3.5% ceiling on total compensation, including a 3% ceiling on YSP, it charged to wholesale borrowers, subject to exceptions made by wholesale channel managers. These caps allowed wide discretion to mortgage brokers because the maximum permissible amount far exceeded the average total compensation charged by its mortgage brokers between 2005 and 2009.

57. Other than these caps, SunTrust Mortgage did not establish any objective criteria, or provide guidelines, instructions or procedures to be followed by brokers in setting the amount of total compensation to be charged to borrowers. Mortgage brokers exercised this pricing discretion SunTrust Mortgage gave them, untethered to any objective credit characteristics, on every loan they brought to SunTrust Mortgage for origination and funding. SunTrust Mortgage affirmed or ratified tyhese discretionary pricing adjustments for all the wholesale loans it originated and funded. SunTrust Mortgage did not review the reasonableness of charges that fell within the ceiling before including them in the terms of the loan. Moreover, SunTrust Mortgage funded hundreds of mortgage loans in 2009 that included total compensation exceeding the ceiling dictated by its policy.

58. Charging higher total compensation on the basis of race and national origin, whether through SunTrust Mortgage's inclusion of a higher YSP or higher direct broker fees in the price of the mortgage loan, is a discriminatory lending practice by SunTrust Mortgage prohibited by the FHA and the ECOA.

59. For each wholesale mortgage loan that SunTrust Mortgage originated, information about each borrower's race and national origin and the amount and types of broker fees paid was available to, and was known by, SunTrust Mortgage prior to the approval and funding of the loan. SunTrust Mortgage was required to collect, maintain, and report data with respect to significant mortgage loan terms and borrower information for residential loans, including the race and national origin of each wholesale home loan borrower, pursuant to HMDA.

60. SunTrust Mortgage regularly monitored between 2005 and 2009 the race and national origin disparities in total compensation it charged on wholesale mortgage loans, and it knew race and national origin disparities in total compensation existed throughout that period on the national level and in multiple regional markets. Notwithstanding its knowledge about these disparities, SunTrust Mortgage's "Broker Fair Lending Communication Strategy" from March 2009 told its executives who managed relationships with mortgage brokers that brokers "should not be given any specific guidance as to how to eliminate or minimize disparities in pricing."

61. Statistical analyses of wholesale mortgage loans originated by SunTrust Mortgage between January 2005 and December 2009 demonstrate statistically significant discriminatory pricing disparities in wholesale mortgage loans based on race and national origin.

62. Measured on a nationwide basis by total compensation, in each year between 2005 and 2009, SunTrust Mortgage charged African-American borrowers whom SunTrust Mortgage determined had the credit characteristics to qualify for a home mortgage loan more in pricing

adjustments not based on borrower risk for wholesale loans than non-Hispanic white borrowers. The annual total compensation disparities ranged between approximately 20 and 66 basis points, and they are statistically significant.

63. Measured on a nationwide basis by total compensation, in each year between 2005 and 2009, SunTrust Mortgage charged Hispanic borrowers whom SunTrust Mortgage determined had the credit characteristics to qualify for a home mortgage loan more in pricing adjustments not based on borrower risk for wholesale loans than non-Hispanic white borrowers. The annual total compensation disparities ranged between approximately 16 and 29 basis points, and they are statistically significant.

64. In approximately 52% of high loan-volume markets in 2005 (11 of 21), defined for purposes of this paragraph as those MSAs and non-MSA areas in each state where SunTrust Mortgage made more than 100 total wholesale mortgage loans and 30 or more wholesale mortgage loans to African-American borrowers in a given year, SunTrust Mortgage charged African-American borrowers more in pricing adjustments not based on borrower risk for wholesale loans, as measured by total compensation, than non-Hispanic White borrowers by a statistically significant amount. In 2006, approximately 43% of such markets (15 of 35); in 2007, approximately 65% of such markets (28 of 43); in 2008, approximately 88% of such markets (21 of 24); and in 2009, approximately 82% of such markets (9 of 11) showed statistically significant total compensation disparities disfavoring African-American wholesale borrowers. The disparities in pricing adjustments not based on borrower risk resulted in African-American borrowers in these markets paying between approximately 15 and 126 basis points more than non-Hispanic white borrowers for wholesale loans in a given year. Between 2007 and 2009, there were no high loan volume markets in which SunTrust Mortgage charged non-Hispanic white borrowers statistically significant higher total compensation for wholesale loans than African-American borrowers in a given year; in 2005 and 2006, the number of such markets in a given year ranged only between 1 and 3, or 5% to 9% of the high loan volume markets.

65. In approximately 58% of high loan volume markets in 2005 (18 of 31), defined for purposes of this paragraph as those MSAs and non-MSA areas in each state where SunTrust Mortgage made more than 100 total wholesale mortgage loans and 30 or more wholesale mortgage loans to Hispanic borrowers in a given year, SunTrust Mortgage charged Hispanic borrowers more in pricing adjustments not based on borrower risk for wholesale loans, as measured by total compensation, than non-Hispanic white borrowers by a statistically significant amount. In 2006, approximately 58% of such markets (23 of 40); in 2007, approximately 66% of such markets (29 of 44); in 2008, approximately 91% of such markets (30of 33); and in 2009, approximately 65% of such markets (11 of 17) showed statistically significant total compensation disparities disfavoring Hispanic wholesale borrowers. The disparities in pricing adjustments not based on borrower risk resulted in Hispanic borrowers in these markets paying between approximately 8 and 102 basis points more than non-Hispanic white borrowers for wholesale loans in a given year. In 2005, 2008, and 2009, there were no high loan volume markets in which SunTrust Mortgage charged non-Hispanic white borrowers statistically significantly higher total compensation for wholesale loans than Hispanic borrowers in a given year; in 2006 and 2007, the number of such markets in a given year ranged only between 1 and 4, or 2% to 10% of the high volume loan markets.

66. In setting the terms and conditions for its wholesale mortgage loans, including interest rates, points, and fees, SunTrust Mortgage accounted for individual borrowers' differences in credit risk characteristics by setting the prices shown on its rate sheets and pricing adjustments worksheets for each loan product to include its assessment of applicant creditworthiness as explained in Paragraphs 47-49. SunTrust Mortgage's mortgage brokers' pricing adjustments, as measured by total compensation, were separate from and not controlled by the credit risk adjustments already reflected in the rate sheets and pricing adjustments worksheets. SunTrust Mortgage reviewed these pricing adjustments and then charged them to borrowers in the loans it originated and funded. Accordingly, the race and national origin

total compensation disparities described in Paragraphs 61-64 are not adjusted for borrowers' credit risk characteristics.

67. Regression analyses of SunTrust Mortgage wholesale pricing that control for credit- related factors such as credit score, loan amount, loan to value ratio, loan purpose, and others, also demonstrate that the race and national origin disparities in pricing adjustments described in Paragraphs 61-64 produced race and national origin disparities in the annual percentage rate of interest charged by SunTrust Mortgage between 2005 and 2009 to African-American and Hispanic wholesale borrowers that cannot be explained by credit risk factors. Thus, accounting for borrower credit risk factors does not explain the race and national origin disparities, even if those factors were relevant to the subjective pricing adjustments measured by'total compensation.

68. The statistically significant race and national origin disparities in total compensation described in Paragraphs 61-64 for African-American and Hispanic wholesale borrowers who SunTrust Mortgage determined had the credit characteristics to qualify for a home mortgage loan resulted from the implementation and the interaction of SunTrust Mortgage's policies and practices that:

(a) included pricing terms based on the subjective and unguided discretion of mortgage brokers in setting pricing adjustments not based on borrower risk for wholesale loans, as measured by total compensation, in the terms and conditions of loans SunTrust Mortgage originated after the loan price had been established by reference to credit risk characteristics;

(b) did not require mortgage brokers to justify or document the reasons for the amount of pricing adjustments not based on borrower risk for wholesale loans, as measured by total compensation;

(c) failed to adequately monitor for and fully remedy the effects of race and national origin disparities in total compensation; and (d) created a financial incentive for mortgage brokers to charge interest rates above the interest

rates SunTrust Mortgage had set based on credit risk characteristics. Total compensation specifically measures the pricing variation caused by the subjective and unguided pricing adjustments not based on borrower risk. SunTrust Mortgage continued to use these discretionary wholesale pricing policies, to inadequately document and review the implementation of that pricing component, and to incentivize upward broker adjustments to pricing through at least the end of 2009.

69. SunTrust Mortgage's policies and practices identified in the previous Paragraph were not justified by business necessity or legitimate business interests. There were less discriminatory alternatives available to SunTrust Mortgage than these policies or practices.

70. SunTrust Mortgage had knowledge that the subjective and unguided discretion it granted to mortgage brokers in its wholesale mortgage loan pricing policies and practices was being exercised in a manner that discriminated against African-American and Hispanic borrowers, but continued to implement its policies and practices with that knowledge. SunTrust Mortgage did not take effective action before the end of 2009 to change the pricing adjustment policies or practices to fully eliminate their discriminatory impact, nor did it change its compensation policy to discourage the charging of higher pricing adjustments. It did not act before the end of 2009 to identify or compensate the individual borrowers who were victims of its discriminatory wholesale mortgage loan pricing policies or practices.

71. Plaintiff also sought to have his Mortgage Loan modified, Defendant, however, led Plaintiff on for an extended period, but ultimately also failed to modify the Mortgage Loan.

FAIR HOUSING ACT and EQUAL CREDIT OPPORTUNITY ACT VIOLATIONS

72. SunTrust Mortgage's residential lending-related policies and practices and the policies and practices it followed in residential credit transactions as alleged herein constitute:

a. Discrimination on the basis of race and national origin in making available, or in the terms or conditions of, residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a);

b. Discrimination on the basis of race and national origin in the terms, conditions, or privileges of the provision of services in connection with sale of a dwelling, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b); and

c. Discrimination against applicants with respect to credit transactions on the basis of race and national origin in violation of the Equal Credit Opportunity Act. 15 U.S.C. § 1691(a)(1).

73. SunTrust Mortgage's residential lending-related policies and practices as alleged herein constitute:

a. A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691 f; and

b. A denial of rights granted by the Fair Housing Act to a group of persons - both African-Americans and Hispanics - that raises an issue of general public importance.

74. Between 2005 and 2009, more than 20,000 persons throughout the nation have been victims of SunTrust Mortgage's pattern or practice of discrimination and denial of rights as alleged herein. In addition to higher direct economic costs, some of the victims of discrimination suffered additional consequential economic damages resulting from having an excessively costly loan, including possible increased risk of credit problems, and other damages, including emotional distress. They are aggrieved persons as defined in the Fair Housing

Act, 42 U.S.C. § 3602(i), and aggrieved applicants as defined in the Equal Credit Opportunity Act, 15 U.S.C. § 1691e, and have suffered injury and damages as a result of SunTrust Mortgage's conduct. Attachment A depicts the states where these aggrieved persons described in Paragraphs 35 and 63-64 were located when the discrimination occurred.

75.  SunTrust Mortgage's policies and practices, as described herein, were intentional, willful, or implemented with reckless disregard for the rights of African-American and Hispanic borrowers.

76. Sun Trust Mortgage's failure to modify Plaintiff's Mortgage Loan also involved discrimination on the basis of race in violation of the Fair Housing Act and the Equal Credit Opportunity Act.

77. This case qualifies for equitable tolling of the applicable statutes of limitations and, therefore, is timely.

RELIEF REQUESTED

WHEREFORE, Plaintiff prays that the Court enter an ORDER that:

(1) holds that the actions of the Defendant with respect to its Mortgage Loan to the Plaintiff complained of herein constitute a violation of the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691 f;

(2) holds that the actions of the Defendant with respect to its failure to Modify Plaintiff's Mortgage Loan complained of herein constitute a separate violation of the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691 f; and

(3) Awards monetary damages to Plaintiff, as a victim of the Defendant's discriminatory policies and practices, for the injuries

caused by the Defendant, including direct economic costs, consequential economic damages, and other damages, in the amount of $600,000.

Plaintiff further prays for such additional relief as the interests of justice may require.

*Plaintiff also demands a trial by Jury.*

Respectfully,

Leicester Stovell, Esq.
D.C. Bar No. 488149
Attorney for Plaintiff
Law Office of Leicester Stovell, Esq.
631 12th Street, N.E.
Washington, D.C. 20002
(202) 302-0657
Leicester1@aol.com